## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JAMIE LEE HENRY,

and

ANNA GABRIELIAN;

       *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington, DC 20530,

and

UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES,
200 Independence Avenue, SW
Washington, DC 20201,

and

UNITED STATES DEFENSE HEALTH AGENCY,
7700 Arlington Boulevard
Suite 5101
Falls Church, VA 22042;

       *Defendants*.

Civil Action No.

**<u>INTRODUCTION</u>**

Plaintiffs, Dr. Jamie Lee Henry and Dr. Anna Gabrielian, built their careers on the principle that medicine is a commitment to service – to first do no harm, and to always put others before self. Dr. Henry served nearly two decades as an internal medicine physician in the United States Army, leaving the service as a Major. Dr. Gabrielian, an anesthesiologist, built a career at one of the world's leading hospitals. In September 2022, the United States Department of Justice ("DOJ") publicly accused Dr. Henry and Dr. Gabrielian of felony offenses related to the handling of medical records. Though neither espionage nor treason were ever charged, the DOJ framed its alleged case in sweeping, sensational terms. An official press release – drawing from a faulty indictment – invoked themes of national betrayal and foreign allegiance, branding Plaintiffs as threats to the United States. Nationwide, media outlets amplified the DOJ's narrative, triggering a reputational catastrophe that eviscerated Plaintiffs' careers, finances, and personal lives.

The prosecution soon unraveled. Defense counsel exposed material errors in the original indictment, forcing the DOJ to issue a superseding indictment. Even then, the case failed. After a mistrial, this Court dismissed all charges with prejudice, ruling that the DOJ violated the Speedy Trial Act through dilatory conduct and neglect. But the damage was already done. If the DOJ could not prove that Dr. Henry and Dr. Gabrielian were traitors in a court of law, they could at least brand them as such in the court of public opinion. And in that, the DOJ succeeded – shattering the lives of both Dr. Henry and Dr. Gabrielian.

It was not until February 27, 2026 – more than twenty-one months after this Court dismissed all charges with prejudice – that DOJ updated its press release to add a short note acknowledging the dismissal. That update was too little, too late: it came after DOJ-sourced

information had already eviscerated Plaintiffs' medical careers, and it failed to correct, withdraw, or supersede the materially false and misleading allegations that remained in the press release.

Under the Privacy Act and the Fifth Amendment, this action seeks to correct and expunge inaccurate records and to obtain damages for the extraordinary harm to Dr. Henry and Dr. Gabrielian already recognized by this Court. Plaintiffs challenge DOJ's publication, maintenance, dissemination, and belated partial annotation of a materially false, outdated, and misleading press release; the incorporation of DOJ-sourced press-release information into federal background-screening systems relied upon by healthcare employers and licensing bodies; and the maintenance and dissemination of NPDB records that falsely portray dismissed allegations as findings of professional misconduct. Dr. Henry further seeks relief for the resulting deprivation of his protected liberty interest through government-mandated professional exclusion and blacklisting.

## THE PARTIES

1.      Plaintiff, Dr. Jamie Lee Henry, is a citizen of the United States, a licensed and board-certified internal medicine physician, and former U.S. Army Major residing in the State of Maryland in Montgomery County.

2.      Plaintiff, Dr. Anna Gabrielian, is a citizen of the United States and a licensed and board-certified anesthesiologist residing in the State of Maryland in Montgomery County.

3.      Defendant, United States Department of Justice ("DOJ"), is an agency of the United States government which can be located at the address listed in the caption. DOJ maintains and disseminates records concerning individuals, including press releases and other public-facing and background-screening records, and is responsible for compliance with the Privacy Act with respect to those records. *See generally* 5 U.S.C. § 552a.

4.      Defendant, United States Department of Health and Human Services ("HHS"), is an agency of the United States government which can be located at the address listed in the caption. HHS administers and maintains the National Practitioner Data Bank ("NPDB"), a federal system of records used nationwide by hospitals, credentialing bodies, licensing authorities, and healthcare employers.

5.      Defendant, Defense Health Agency ("DHA"), is an agency of the United States government within the Department of Defense which can be located at the address listed in the caption. DHA exercises clinical privileging authority over physicians practicing within the Department of Defense healthcare system and reports adverse privileging actions to federal practitioner-reporting systems.

**JURISDICTION AND VENUE**

6.      This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Constitution and the laws of the United States.

7.      This Court has jurisdiction over Plaintiffs' Privacy Act claims pursuant to 5 U.S.C. § 552a(g)(1), which authorizes civil actions in federal district court.

8.      Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States acting in their official capacities, Plaintiffs reside in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

9.      Venue is also proper under 5 U.S.C. § 552a(g)(5) because Plaintiffs reside in this District and because the records at issue are maintained and disseminated by Defendants in a manner that caused adverse effects within this District.

10.      Venue is further proper because Defendants' actions causing reputational stigma and professional exclusion were felt by Plaintiff, Dr. Henry, in this District.

## TIMELINESS OF CLAIMS

11.     Under the Privacy Act, a civil action must be filed "within two years from the date on which the cause of action arises." 5 U.S.C. § 552a(g)(5).

12.     However, courts have found that the doctrine of equitable tolling can apply in instances where prospective Privacy Act plaintiffs were being prosecuted by the United States, and where plaintiffs reasonably feared adverse consequences in such prosecution if they brought a Privacy Act claim against a United States agency. *See Chung v. United States DOJ*, 333 F.3d 273, 275-276 (D.C. Cir. 2003).

13.     Plaintiffs' earliest Privacy Act claim concerning DOJ's September 29, 2022, press release accrued no earlier than that date. Other claims accrued later, including when DOJ continued to maintain, confirm, and disseminate inaccurate information after the criminal case was dismissed with prejudice on May 22, 2024; when DOJ-sourced information was confirmed as current in Dr. Gabrielian's FACIS report in August 2024; and when DHA and HHS maintained and disseminated Dr. Henry's NPDB report in November and December 2025.

14.     To the extent any claim is deemed to have accrued before May 22, 2024, equitable tolling applies because Plaintiffs were then being prosecuted by the United States and reasonably feared that bringing Privacy Act claims against a federal agency during the pending criminal case could adversely affect their defense. *See Chung*, 333 F.3d at 275-276.

15.     Accordingly, Plaintiffs' claims are timely because they either accrued within two years of this filing or because equitable tolling applies.

16.     Plaintiffs' Privacy Act claims are therefore timely.

## THE FACTS

### A.  Plaintiffs' Medical Careers and Global Humanitarian Backgrounds

17.    Plaintiff, Dr. Jamie Lee Henry, is a board-certified internal medicine physician and former Major in the United States Army. He served nearly twenty years as a military physician, treating service members and their families at Walter Reed Army Medical Center, Walter Reed National Military Medical Center, and Fort Bragg.

18.    Dr. Henry's military career continued his family's legacy of service going back eleven generations: both his grandfathers served in the U.S. Army during the Second World War, and men from the Henry family also fought in the Vietnam War, First World War, the Civil War, the War of 1812, and the Revolutionary War. Though not in the military, Dr. Henry's father, also a physician, worked as an orthopedic surgeon in Zaire, Kenya, Ivory Coast, Benin, and Ecuador.

19.    During his service, Dr. Henry was credentialed and privileged within the Department of Defense healthcare system and subject to its clinical privileging authorities.

20.    Plaintiff, Dr. Anna Gabrielian, is a physician and anesthesiologist who trained at leading academic medical institutions and practiced at Johns Hopkins University Hospital.

21.    Throughout her career, she was subject to hospital credentialing, background-screening, and licensing regimens that rely on federal records maintained and disseminated by government agencies.

22.    Dr. Henry and Dr. Gabrielian both had long records of global humanitarian work, medical service, and efforts to use medicine to relieve human suffering around the world.

23.    Dr. Henry spent years treating wounded, ill, and injured service members at Walter Reed Army Medical Center and Walter Reed National Military Medical center; conducted infectious-disease research on combat-related fungal wound infections; earned a Global Emerging

Infectious Surveillance grant to work in an AIDS clinic in Tanzania, and studied Swahili for that work; applied to Doctors Without Borders; supported care for refugees in Cambodia; supported children in Bolivia and Rwanda; cared for Syrian and Iraqi refugee children in Greece; and had even offered to house a displaced Ukrainian mother and her children free of charge. His life and medical career reflected a sustained commitment to serving wounded patients, refugees, children, and people caught in war and crisis.

24.    Dr. Gabrielian's record reflected the same global humanitarian orientation. Born in Russia, her family fled to the United States after the fall of the Soviet Union. She had a distinguished career of performing antiviral and transplant-related research; had volunteered with the Red Cross and Wounded Warriors program; worked on safe opioid-disposal efforts to reduce diversion in Baltimore; and pioneered a project to improve care for mothers with chronic pain. At Johns Hopkins, she worked with colleagues and Ukrainian physicians on medical education and maternal-health projects, helped develop battlefield medicine and obstetric anesthesia protocols for Ukraine, gathered supplies and resources for Ukrainian medical needs, and contributed to international quality-improvement projects designed to improve the lives of pregnant mothers in Ukraine. She intended to replicate these programs in other countries, including Russia. Additionally, she contributed to a training program in Sierra Leone geared towards improving maternal and pediatric mortality rates. She also worked as a medical translator and pursued additional medical translation training because she viewed language access as central to making healthcare available to all those suffering across national and cultural lines.

25.    Consistent with that humanitarian background, in the summer of 2022 Dr. Gabrielian contacted the Red Cross, the Moscow School of Medicine, and the Russian Embassy

to offer her expertise as a physician and anesthesiologist to help reduce human suffering and save lives. Meanwhile, Dr. Henry contacted Doctors Without Borders.

26.    Dr. Gabrielian's message to the Russian Embassy stated: "My husband and I are both doctors. I am an anesthesiologist, he works in intensive care. We are ready to help if there is a need for that. We are for life, and we do not want to cut off Russia from the international community."

**B.  The Investigation, Indictments, and Dismissal with Prejudice**

27.    At approximately 7:00 a.m. on August 17, 2022, Dr. Gabrielian was walking from her car to Johns Hopkins University Hospital when a stranger approached, greeted her in Russian, and stated that she had been asked to follow up regarding the assistance Dr. Gabrielian had recently offered. Dr. Gabrielian asked the stranger if she was from the Russian Embassy. The stranger said yes.

28.    That stranger was an undercover FBI agent ("UC"), and that meeting marked the beginning of the investigation that ultimately led to September 28, 2022, indictment charging Dr. Henry and Dr. Gabrielian with offenses related to the handling of medical records.

29.    After their meeting in the parking garage, Dr. Gabrielian met with the UC four times. Dr. Henry was present at two of those meetings. At the first substantive meeting after their interaction in the parking garage, Dr. Gabrielian saw the UC's camera and mentioned this to the UC. Their interaction was in Russian, and the UC subsequently did not mention to the rest of the FBI investigative team that Dr. Gabrielian had seen her camera.

30.    The indictment was framed in sweeping terms revolving around threats to U.S. national security, but no charges of espionage, treason, or national-security offenses were brought against Dr. Henry or Dr. Gabrielian.

31.     The DOJ's charging theory evolved across three indictments – an original indictment dated September 28, 2022; a superseding indictment dated May 3, 2023; and a second superseding indictment dated November 7, 2023, – with factual allegations removed or materially narrowed in successive superseding filings. *See* Indictment, *United States v. Gabrielian*, No. SAG-22-336 (D. Md. Sept. 28, 2022), ECF No. 1; Superseding Indictment, *Id.* (May 3, 2023), ECF. No. 75; Second Superseding Indictment, *Id.* (Nov. 7, 2023), ECF No. 172.

32.     After acknowledging misrepresentations and mischaracterizations of evidence to Dr. Henry and Dr. Gabrielian's defense counsel, the DOJ removed or materially altered certain allegations in its superseding indictment.

33.     For example, the original indictment stated that Dr. Gabrielian was motivated by patriotism toward Russia to provide any assistance she could to Russia, "even if it meant being fired or going to jail." *See* Indictment, *United States v. Gabrielian*, No. SAG-22-336 (D. Md. Sept. 28, 2022), ECF No. 1, ¶ 14c.

34.     In its superseding indictment, the DOJ removed the assertion that Dr. Gabrielian would provide any assistance she could to Russia "even if it meant being fired or going to jail" and removed the assertion that Dr. Gabrielian stressed, in a meeting with the UC, "the need for 'plausible deniability.'" Superseding Indictment, ECF No. 75, ¶ 14c.

35.     During trial, the DOJ provided the UC recording to Dr. Gabrielian's defense counsel, and the recording had Dr. Gabrielian say the opposite: "I do not want to risk being fired or going to jail."

36.     In its superseding indictment, the DOJ removed its assertion from the original indictment that Dr. Gabrielian called Dr. Henry a "coward" because he would be unlikely to violate HIPAA [Health Insurance Portability and Accountability Act], and its assertion that Dr. Gabrielian

claimed to violate HIPAA "all the time." Superseding Indictment, ECF NO. 75, ¶ 14q. These quotes did not appear in any FBI transcript.

37.     On April 22, 2023 – in an email exchange with Dr. Gabrielian's defense counsel during the trial – the DOJ's lead prosecutor, Aaron Zelinsky, agreed that the allegation that Dr. Gabrielian violated HIPAA "all the time" was "demonstrably false" and was not found in any FBI transcript from her meetings with the UC.

38.     Although Dr. Gabrielian and Dr. Henry's defense counsel repeatedly requested the disclosure of the identity, Russian language fluency, and possible biases of the individual who provided translations of the original quotes to the FBI and DOJ, that information was never provided.

39.     Matthew Walker, the FBI Special Agent ("SA") in charge of the investigation, admitted at trial that the FBI's background investigations found "nothing negative" about either Dr. Henry or Dr. Gabrielian. He further agreed – under oath – that Dr. Gabrielian's email offering humanitarian aid was innocuous.

40.     SA Walker also admitted that, during the FBI's background investigation, he missed exculpatory information concerning Dr. Gabrielian's prior humanitarian medical work. On cross examination, he acknowledged that he did not locate a publicly available grant application in which Dr. Gabrielian described her goal of conducting a medical outreach mission to Ternopil, Ukraine, to share her anesthesia experience, provide medical education and resources, and support Ukrainian medical colleagues and patients.

41.     Thus, before the arrest, indictment, press release, and trial – all of which framed Dr. Gabrielian and Dr. Henry as national-security threats motivated by allegiance to Russia – the FBI

had found "nothing negative" in their backgrounds and had also missed available evidence consistent with Dr. Gabrielian's longstanding humanitarian outreach.

42.     On May 22, 2024, the United States District Court for the District of Maryland dismissed all charges against both Plaintiffs with prejudice.

43.     In its dismissal order, this Court held that the DOJ violated the Speedy Trial Act through dilatory conduct and neglect.[1]

44.     The Court described the charges as "highly unusual."[2] Rarely, if ever, had allegations of violating HIPAA been paired with accusations invoking espionage and treason.

45.     The Court ruled that the medical records at issue were "a few relatively inconsequential records (in terms of the nature of the medical information contained), which would be of no evident use to any foreign government."[3]

46.     Twice, the Court expressed its "grave concerns" over the DOJ's handling of the case.[4]

47.     The Court rebuked the DOJ for its "dilatory" conduct,[5] and its decision to pursue "radio silence" with the Court by not responding to defense counsel or following the Court's agreed-upon procedures despite consistent, repeated outreach from defense counsel.[6]

---

[1] *United States v. Gabrielian*, No. SAG-22-336, 2024 U.S. Dist. LEXIS 92277, at *44 (D. Md. May 22, 2024).

[2] *Gabrielian*, 2024 U.S. Dist. LEXIS 92277, at *3.

[3] *Gabrielian*, 2024 U.S. Dist. LEXIS 92277, at *2-*3.

[4] *Gabrielian*, 2024 U.S. Dist. LEXIS 92277, at *30 and *63.

[5] *Gabrielian*, 2024 U.S. Dist. LEXIS 92277, at *55 and *68.

[6] *Gabrielian*, 2024 U.S. Dist. LEXIS 92277, at *5.

48.     The Court thus rebuked the DOJ for its "unilateral" disregard of procedures.[7] The Court wrote: "The government badly misconstrued its obligations…displayed a serious pattern of neglect…and flipped the CIPA [Classified Information Procedures Act] process on its head."[8]

49.     Dismissal with prejudice permanently terminated all criminal exposure for the conduct described in the indictment and foreclosed the DOJ from further prosecuting Dr. Henry or Dr. Gabrielian on those allegations.

## C. DOJ's Press Release and the National-Security Narrative

50.     On September 29, 2022, the day after the original indictment was returned, DOJ and the United States Attorney's Office for the District of Maryland ("USAO-D. Md.") published a press release describing the indictment.[9]

51.     It was not until February 27, 2026 – more than twenty-one months after this Court dismissed all charges with prejudice – that DOJ updated the press release to add a short note acknowledging that all charges had been dismissed with prejudice on May 22, 2024. The body of the press release, however, remained materially unchanged.

52.     Like the indictment itself, the press release framed the case in national-security terms, including assertions that Dr. Henry and Dr. Gabrielian were motivated by allegiance to

---

[7] *Gabrielian*, 2024 U.S. Dist. LEXIS 92277, at *5, *42-*43, *54, *64.

[8] *Gabrielian*, 2024 U.S. Dist. LEXIS 92277, at *43-*44.

[9] U.S. Department of Justice, *Major in the United States Army and a Maryland Doctor Facing Federal Indictment for Allegedly Conspiring to Provide Confidential Health Information to Russia* (Sept. 29, 2022, updated Feb. 27, 2026), https://www.justice.gov/usao-md/pr/major-united-states-army-and-maryland-doctor-facing-federal-indictment-allegedly. Accessed September 23, 2025.

Russia and sought to harm the United States – allegations associated with espionage and treason, though no such charges were filed.

53. The press release identifies Dr. Henry and Dr. Gabrielian by name, occupation, and alleged conduct.

54. Major media outlets – including but not limited to the *New York Times, Washington Post, Wall Street Journal,* CNN, CNBC, NBC, and CBS – drew upon the DOJ press release and indictment by amplifying the DOJ's espionage framing.[10]

55. Local outlets in Maryland described the case in the language of spying and espionage. WBAL-TV described the proceedings as a "spy trial," reported that the Plaintiffs were "accused of trying to be Russian spies," and described them as "accused of trying to be Russian assets." A Rockville, MD-area student newspaper published an article under the headline "Watch out: Russian Spies could be your next-door neighbor," identified Dr. Henry and Dr. Gabrielian by name, and described the FBI presence in their neighborhood.[11]

---

[10] See, among others, Ken Dilanian, *Johns Hopkins Doctor and Army Doctor Spouse Charged with Conspiring to Give U.S. Medical Info to Russia*, NBC News (Sept. 29, 2022), https://www.nbcnews.com/politics/national-security/johns-hopkins-doctor-army-doctor-spouse-charged-conspiring-give-us-sol-rcna50015; Hannah Rabinowitz, *Army Doctor and Anesthesiologist Spouse Accused of Plot to Give Medical Records to Russian Government*, CNN (Sept. 29, 2022), https://www.cnn.com/2022/09/29/politics/us-army-doctor-anesthesiologist-russian-government-medical-records; Christine Hauser, *Army Doctor and Spouse Charged in Plot to Give U.S. Medical Records to Russia*, N.Y. Times (Sept. 29, 2022), https://www.nytimes.com/2022/09/29/us/army-doctor-russia-plot.html; Sadie Gurman & Aruna Viswanatha, *Army Major, Wife Charged with Conspiring to Give Medical Records to Russians*, Wall St. J. (Sept. 29, 2022), https://www.wsj.com/us-news/crime/army-major-wife-charged-with-conspiring-to-give-medical-records-to-russians-11664478497; Dan Morse & Spencer S. Hsu, *Md. Couple Accused of Trying to Leak Medical Records to Russia*, Wash. Post (Sept. 29, 2022), https://www.washingtonpost.com/dc-md-va/2022/09/29/maryland-spy-couple-russia-leak/.

[11] Kate Amara, *Jurors Hear from FBI Agent, Co-Defendant in Russian Spy Trial*, WBAL-TV 11 News (May 25, 2023), https://www.wbaltv.com/article/russia-spy-trial-fbi-agent-defendant-testify/44007192; Kate Amara, *Jury Deadlocked in Maryland Russian Spy Trial*, Mistrial

56.     The press release frames Plaintiffs' conduct in national-security and espionage terms despite the absence of such charges and despite this Court's finding that the records at issue were "relatively inconsequential" and "of no evident use" to any foreign government.

57.     The press release states that "a federal grand jury has returned an indictment" but it omits the dispositive fact that those charges were dismissed with prejudice on May 22, 2024, rendering the statement untimely and incomplete.

58.     Notwithstanding the February 27, 2026, update, the press release's headline still describes Dr. Henry and Dr. Gabrielian as currently "facing federal indictment" and states that they face possible prison time – a provably false statement.

59.     The press release also continues to include the statement that, "[i]f convicted," Dr. Henry and Dr. Gabrielian faced prison time. After dismissal with prejudice, that statement was no longer timely, complete, or fair unless clearly withdrawn, corrected, or superseded in the body of the release. DOJ's later update did not remove or correct that statement.

60.     The press release continues to contain prosecution-era language implying an ongoing or unresolved criminal case, including language that Plaintiffs were "Facing Federal Indictment," that they were scheduled or expected to have initial appearances, and that they faced possible prison sentences. The February 27, 2026, update did not revise those statements in the body of the press release.

---

*Declared*, WBAL-TV 11 News (June 1, 2023), https://www.wbaltv.com/article/spy-trial-mistrial-maryland-doctors-russia/44038739; Julia Lvovsky, *Watch Out: Russian Spies Could Be Your Next-Door Neighbor*, Common Sense (Oct. 24, 2022), https://woottoncommonsense.com/14045/news/watch-out-russian-spies-could-be-your-next-door-neighbor/; also published in The Sentinel (Oct. 27, 2022), https://www.thesentinel.com/communities/watch-out-russian-spies-could-be-your-next-door-neighbor/article_52c4fc24-5628-11ed-bdc7-dbfab3b3a80a.html.

61.     Even after the February 27, 2026, update, the press release continued to refer only to the original indictment and omitted superseding indictments and complete procedural history, including the removal or narrowing of allegations in later charging documents.

62.     For example, the press release continues to state that Dr. Gabrielian claimed she was willing to help Russia "even if it meant being fired or going to jail." The February 27, 2026, update does not disclose that DOJ later retracted that allegation from the superseding indictment.

63.     The press release continues to claim that Dr. Henry and Dr. Gabrielian "offered" medical records to the UC, though DOJ emails show the Assistant United States Attorney instructed the UC to elicit medical records because such an offer had not occurred. The February 27, 2026, update did not correct or qualify this allegation.

64.     The press release continues to claim that Dr. Gabrielian had no concerns about violating HIPAA, though the DOJ retracted this allegation in its Superseding Indictment. Superseding Indictment, ECF NO. 75, ¶ 14q. DOJ's February 27, 2026, update did not correct or withdraw this statement from the press release.

65.     The press release continues to frame the alleged disclosures as harmful to U.S. national security because, as it claims, Dr. Henry and Dr. Gabrielian were motivated by "patriotism toward Russia" and were seeking to "help the Russian government."

66.     Yet the press release provides no evidence to support these assertions, nor are they supported by the superseding indictments. Defense materials and transcripts show extensive UC steering of the conversation, ambiguity in the Russian-language translations, and Dr. Gabrielian's concern for her safety. DOJ's February 27, 2026, update did not correct or qualify these allegations.

67.     The press release continues to claim that Dr. Henry investigated "joining the Russian Army." Dr. Henry never did so. DOJ's February 27, 2026, update did not correct or qualify this allegation.

68.     The press release thus continues to depict Dr. Henry and Dr. Gabrielian as proactively seeking to aid the Russian government in the context of allegations associated with treason and espionage, even though no such offenses were charged. DOJ emails and transcripts show that the UC initiated and directed the discussions, with DOJ instructing the UC to solicit medical records after initial meetings produced nothing the DOJ was looking for. The February 27, 2026, update did not correct or qualify this narrative.

69.     Despite DOJ's acknowledgment of misrepresentations and mischaracterizations of evidence in the original indictment – misrepresentations that also appeared in the press release – DOJ did not correct or annotate the press release when it was filed in the superseding indictment in May 2023; did not correct or annotate it when all charges were dismissed with prejudice in May 2024; and did not add any dismissal note until nearly two years after dismissal, on February 27, 2026. Even then, DOJ left the materially false and misleading body of the press release entirely intact.

70.     From May 22, 2024, until February 27, 2026, DOJ continued to maintain and disseminate the September 29, 2022, press release without any update acknowledging dismissal with prejudice. On February 27, 2026, DOJ added a short update acknowledging dismissal, but did not withdraw the press release, did not revise the headline, did not remove the national-security framing, did not correct the withdrawn or mischaracterized allegations, did not disclose the superseding indictments, and did not acknowledge this Court's findings concerning DOJ's dilatory conduct, neglect, and mishandling of the prosecution.

16

71. No court, tribunal, or federal administrative body has ever found that Dr. Henry or Dr. Gabrielian engaged in espionage or treason, or that either Plaintiff harmed any patient. Notwithstanding this, DOJ continued for more than twenty-one months after dismissal with prejudice to maintain and disseminate the September 29, 2022, press release without any dismissal update, and its February 27, 2026, update still left in place a materially misleading account of Plaintiffs' legal status, conduct, and alleged motives.

72. DOJ's publication, maintenance, delayed annotation, and continued dissemination of the press release did not remain confined to DOJ's website. The press release and its national-security framing were incorporated into background-screening and professional-reporting systems used to make employment, credentialing, licensing, and privileging decisions about the Plaintiffs.

**D. DOJ-Sourced Information in Federal Background Screenings**

73. Following publication of the September 29, 2022, DOJ press release, information from that record was incorporated verbatim into third-party background-screening systems used by healthcare employers, including the Fraud and Abuse Control Information System ("FACIS") Level 3 background check, FACIS Record No. 1277755184.

74. FACIS Level 3 is the highest level of background screening used for healthcare professionals. Hospitals, credentialing bodies, and healthcare employers routinely rely upon it when making employment, privileging, and credentialing determinations.

75. Dr. Gabrielian's FACIS report reproduces verbatim the September 29, 2022, DOJ press release. As the "Publication" it is reproducing, it lists: "United States Department of Justice, The United States Attorney's Office, District of Maryland – News and Press Releases." FACIS Level 3 Report No. 1277755184.

76.     The FACIS report states: "The information in this report as of the date of preparation has been confirmed with the issuing agency as being current." The report states that it was completed on August 26, 2024. As Authority, it lists: "United States Department of Justice, The United States Attorneys [sic] Office, District of Maryland."

77.     The report states that Dr. Gabrielian is "Facing Federal Indictment" and that "a federal grand jury has returned an indictment" charging her with criminal offenses, and further states that she is "scheduled to have an initial appearance" in federal court.

78.     The FACIS report further asserts that Dr. Gabrielian "conspired to cause harm to the United States" and acted to assist the Russian government, reproducing verbatim the DOJ press release's national-security and espionage framing.

79.     The FACIS report omits the dispositive fact that all criminal charges against Dr. Gabrielian were dismissed with prejudice on May 22, 2024, even though it represents that DOJ confirmed this information as "current" as of August 21, 2024, more than three months after this Court dismissed all criminal charges against Dr. Henry and Dr. Gabrielian with prejudice.

80.     DOJ knew or reasonably should have known that information it provided to and confirmed for FACIS would be relied upon by healthcare employers to make determinations about Dr. Gabrielian's employment, credentials, and professional standing.

81.     Despite dismissal of the case with prejudice, DOJ failed to correct, amend, annotate, or withdraw the information reproduced in the FACIS report, and failed to ensure that records disseminated to and relied upon by FACIS accurately reflected the case's final disposition. DOJ's February 27, 2026, update came long after the August 2024 FACIS report had already represented DOJ-sourced information as current.

**E. DHA and HHS's NPDB Report Against Dr. Henry**

82. Separately, Dr. Henry was credentialed and privileged as a physician within the Department of Defense healthcare system and thus subject to the privileging authority of DHA.

83. On November 28, 2025, DHA permanently revoked Dr. Henry's clinical privileges.

84. DHA reported that revocation to the NPDB, a federal practitioner-reporting system maintained by HHS. The NPDB report concerning Dr. Henry is identified as DCN 5500000315986936 and was processed on December 23, 2025.

85. The NPDB report identifies the revocation as permanent. It states that it was based on findings of "professional misconduct."

86. However, it does not state what court, or adjudicative body, established those findings, nor does it state any facts on which those findings are based.

87. The NPDB report further states that Dr. Henry "provid[ed] or conspir[ed] to provide medical records to the Russian government."

88. No court or adjudicative body ever found that Dr. Henry provided or conspired to provide medical records to the Russian government.

89. In fact, this Court dismissed with prejudice the criminal allegations on which that narrative relied.

90. Yet the NPDB report did not disclose that the underlying criminal allegations had been dismissed with prejudice, nor did it identify any independent adjudicative finding of professional misconduct separate from the dismissed charges.

91. The NPDB report creates a causal link between dismissed charges and the revocation of Dr. Henry's clinical privileges. Without providing facts or evidence from a record, it implies that the revocation of clinical privileges was the result of unsubstantiated misconduct.

92.     The report does not state that the criminal case against Dr. Henry was dismissed with prejudice, nor does it identify any independent, articulated administrative finding of misconduct separate from the dismissed criminal allegations. At the time the report was issued, Dr. Henry was no longer working at the hospital and was residing in a different state.

93.     The report omits the dispositive fact that the allegations against Dr. Henry in the criminal case were dismissed with prejudice.

94.     NPDB reports are disseminated nationwide to hospitals, credentialing bodies, licensing authorities, and healthcare employers and are routinely consulted – and in practice required to be consulted – in credentialing, privileging, and employment decisions.

## F. Professional, Financial, and Personal Harm to Plaintiffs

95.     The inaccurate and misleading federal records described above caused severe professional, financial, and personal harm to both Plaintiffs. From their arrest in September 2022 until dismissal in May 2024, Dr. Henry and Dr. Gabrielian lived under highly restrictive conditions and supervision.

96.     Initially confined to their home on 24/7 electronic monitoring, they could not work or even drive their children to school. Moreover, the DOJ forbade them from attending their church – a church that Dr. Gabrielian had attended since she was a teenager and where their two children were baptized, even though it fell within the release conditions allowed by the court.

97.     Even after the Court eased restrictions, Dr. Henry and Dr. Gabrielian remained unemployable, "unable to overcome the effect of…reputational damage" to find work.[12]

---

[12] *Gabrielian*, 2024 U.S. Dist. LEXIS 92277, at *66.

98.    Dr. Henry and Dr. Gabrielian both endured "public obloquy far greater than the average defendant, due to the nature of the charges and the extensive national media attention."[13]

99.    That "public obloquy" manifested in "substantial and extraordinary anxiety and concern" from categorical employment blacklisting, mounting litigation costs, and the stigma of espionage and treason accusations.[14]

100.    Amid increasing national attention, Dr. Henry and Dr. Gabrielian's income collapsed. Their adjusted gross income fell nearly 90% from 2022 to 2023, with only minimal recovery by 2024.

101.    Dr. Henry lost out on a one-year, $250,000 contract with Johns Hopkins, a contract which also included a $10,000 signing bonus, the potential for other bonuses, and the opportunity for renewal.

102.    Additionally, working at Johns Hopkins would have given Dr. Henry an internationally renowned platform to practice medicine, granting him access to further lucrative career opportunities.

103.    Dr. Henry's future earnings and employment opportunities have thus been diminished by a significant amount because of his failure to secure the Johns Hopkins contract.

104.    Dr. Henry also lost out on the opportunity for a one year, $550,000 contract because his NPDB entry made it impossible for him to obtain a license in Virginia.

105.    Dr. Henry also incurred financial harms attendant to his military service.

---

[13] *Gabrielian*, 2024 U.S. Dist. LEXIS 92277, at *67-*68.

[14] *Gabrielian*, 2024 U.S. Dist. LEXIS 92277, at *68.

106.    In response to the false information contained in the press release, Dr. Henry received an "other than honorable" discharge after a Board of Inquiry, incurring $20,000 in legal fees and losing military medical retirement benefits for himself and his family.

107.    As a direct result of the false information contained in the press release and indictment, Dr. Henry also incurred substantial legal fees defending himself in federal court.

108.    He also incurred a $5,000 bill for a guardian ad litem in his son's custody case, directly caused by the delays in his criminal case.

109.    Dr. Henry and Dr. Gabrielian were both banned from Johns Hopkins University and affiliated property. Despite the case's dismissal, this ban remains.

110.    The ban from Johns Hopkins properties coincided with Johns Hopkins placing Dr. Gabrielian on leave and prompting her to resign.

111.    As a result of her resignation, Dr. Gabrielian lost out on the opportunity for significant bonuses from Johns Hopkins, as well as lucrative future earning opportunities.

112.    In losing her employment with Johns Hopkins University hospitals, Dr. Gabrielian also lost her eligibility for Public Student Loan Forgiveness, saddling her with more than $300,000 of repayment despite years of qualifying service.

113.    Dr. Gabrielian also lost out on the opportunity for a contract with Shady Grove Hospital, adversely impacting her future employment opportunities and future earnings as a result.

114.    When Dr. Gabrielian applied for medical licensure in Florida, the Florida Board of Medicine stalled her application due to the erroneous information in the background check, which caused loss of employment prospects and made the licensing application moot, whereafter it was withdrawn.

115. Employers in Maryland, Virginia, Pennsylvania, and Florida rejected Dr. Gabrielian's applications after federal background checks, relying on DOJ-maintained records, flagged her as facing federal charges and the possibility of conviction and prison time, even long after the case had been dismissed with prejudice.

116. In fact, since her arrest, trial, and the dismissal of all charges with prejudice, Dr. Gabrielian has applied for work at every major hospital system in the State of Maryland and the Commonwealth of Pennsylvania but has been unable to secure full-time hospital employment in either state.

117. Dr. Gabrielian had to withdraw money from her federal retirement account to pay for her and Dr. Henry's bills and other living expenses, incurring a significant financial penalty in the process.

118. Dr. Gabrielian, while represented by legal counsel, was also fined by state disciplinary boards: $5,000 in Maryland and $1,000 in Pennsylvania.

119. As a direct result of the false information contained in the press release and indictment, Dr. Gabrielian also incurred substantial legal fees defending herself in federal court.

120. The false information contained in the press release and indictment also caused Dr. Gabrielian to incur legal fees defending herself in front of licensing boards in Maryland and Pennsylvania.

121. Because of the false information contained in the press release and indictment, Dr. Gabrielian was unable to secure full-time work until May 1, 2026, working as a traveling physician for outpatient surgeons, incurring significant travel and lodging expenses. She remains unable to obtain employment at any hospital.

122. Dr. Gabrielian's current position as a traveling physician requires her to be away from her family 4-5 days per week because she cannot find work anywhere close to her home in Maryland.

123. Dr. Gabrielian repeatedly sought correction of these records. The FBI refused, disclaiming responsibility. DOJ officials acknowledged the case's dismissal but offered only case-by-case explanations to employers, too late to repair the harm of a flagged background check and negative NPDB entry. DOJ did not add a dismissal update to the press release until February 27, 2026, after the relevant background-screening, licensing, and credentialing damage had already occurred.

124. Dr. Henry, meanwhile, was banned from a church he helped found, severing him from the community and even his own son from a prior marriage.

125. Dr. Henry's son was pulled out of school when Dr. Henry was arrested. Without any reasoned basis for doing so, his stepfather read the Indictment to him, as if it were fact.

126. Dr. Henry and Dr. Gabrielian's youngest son, Theodore – aged 21 months at the time of their arrest – was hospitalized a week after their arrest with breathing problems. He continues to suffer from stress-associated asthma exacerbations. Their middle child, Alexander, still suffers from the trauma of armed federal agents ordering him out of his bedroom.

127. Dr. Henry's ex-wife used the charged conduct against Dr. Henry in their custody battle over their son. Dr. Henry has not seen his son in over three years, save for minimal court-related appearances.

### G. Plaintiffs' Requests for Correction and DOJ's Continuing Failure to Cure the Harm

128.    On December 20, 2025, Dr. Henry and Dr. Gabrielian's former trial counsel contacted USAO-D. Md. and requested that DOJ correct or withdraw the press release to reflect the dismissal with prejudice and the Court's findings.

129.    DOJ did not respond and took no timely corrective action. It waited until February 27, 2026, to add a short dismissal update to the press release. Dr. Henry's and Dr. Gabrielian's latest background reports read as if they are on a five-year probation, implying conviction.

130.    From May 22, 2024, until February 27, 2026, DOJ continued to maintain and disseminate the press release, with its language in the present tense as if the case were still ongoing, while omitting the dispositive fact that the case had been dismissed with prejudice. DOJ's February 27, 2026, update acknowledged dismissal, but did not withdraw the press release, did not revise the materially misleading body of the release, did not correct the allegations DOJ had removed from the superseding indictment, and did not acknowledge this Court's findings concerning DOJ's dilatory conduct, neglect, and mishandling of the prosecution.

131.    These ongoing adverse effects flow from Defendants' maintenance, confirmation, and dissemination of federal records that, during the relevant periods, did not accurately reflect Dr. Henry's and Dr. Gabrielian's legal status or conduct.

132.    Even after DOJ's belated February 27, 2026, update, those records still do not accurately or completely reflect the complete procedural history, the superseding indictments, this Court's findings regarding DOJ's conduct, or the absence of adjudicated findings or evidence of espionage, treason, or patient harm.

**LEGAL CLAIMS**

**COUNT 1: DOJ Press Release**
**Violation of the Privacy Act – 5 U.S.C. § 552a(g)(1)(D)**
**(Both Plaintiffs)**
**(Against Defendant Department of Justice Only)**

133.    Plaintiffs incorporate by reference, repeat, and re-allege all foregoing paragraphs, as if fully set forth herein.

134.    The Privacy Act provides a civil cause of action against a federal agency when the agency fails to comply with any provision of the Act "in such a way as to have an adverse effect on an individual." 5 U.S.C. § 552a(g)(1)(D).

135.    To state a claim under 5 U.S.C. § 552a(g)(1)(D), a plaintiff must allege that: 1) the defendant is a federal agency; 2) the agency failed to comply with a provision of the Privacy Act, including the requirement to maintain records with accuracy, relevance, timeliness, and completeness; 3) the failure caused an adverse effect on the plaintiff; and 4) the agency acted intentionally or willfully.

136.    Where, as here, the agency's intentional or willful violation causes adverse effects that result in pecuniary loss, the plaintiff is entitled to recover actual damages under 5 U.S.C. § 552a(g)(4).

137.    Defendant DOJ is a federal agency within the meaning of the Privacy Act and maintains systems of records and records concerning Plaintiffs.

138.    The Privacy Act requires DOJ to maintain records used to make determinations about individuals with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness in those determinations. 5 U.S.C. § 552a(e)(5).

139. DOJ created, maintains, and presently disseminates the September 29, 2022, press release, as belatedly annotated on February 27, 2026, identifying Plaintiffs by name, profession, and alleged conduct in connection with a federal criminal indictment.

140. The DOJ press release dated September 29, 2022, is plainly a record: "any item, collection, or grouping of information about an individual." 5 U.S.C. § 552a(a)(4); 28 C.F.R. § 16.41(b); *Williams v. Department of Veterans Affairs*, 104 F.3d 670, 673-74 (4th Cir. 1997) (observing that courts have been "lenient" in determining what information constitutes a "record" under the Privacy Act and applying § 552a(a)(4)'s broad statutory definition); *Quinn v. Stone*, 978 F.2d 126, 133 (3d Cir. 1992) (holding this statute has "a broad meaning encompassing *any* information about an individual that is linked to that individual through an identifying particular") (emphasis in original).

141. DOJ maintains the press release and disseminates it as part of systems of records used to inform the public, the media, employers, credentialing bodies, and background-screening entities regarding alleged criminal conduct by Dr. Henry and Dr. Gabrielian, as named individuals.

142. The press release became inaccurate, untimely, and incomplete no later than May 3, 2023, when DOJ filed a superseding indictment materially altering allegations contained in the original indictment, copied in the press release. It became further inaccurate, untimely, and incomplete after May 22, 2024, when this Court dismissed all charges with prejudice. DOJ's February 27, 2026, update did not cure the damage already wrought by those defects.

143. The superseding indictment materially altered certain allegations and mischaracterizations of evidence that appeared in both the original indictment and the September 29, 2022, press release.

27

144.     DOJ did not correct, withdraw, or annotate the press release to reflect those material alterations when it filed the superseding indictment. Nor did DOJ correct, withdraw, or annotate the press release when all charges were dismissed with prejudice on May 22, 2024. When DOJ finally added a dismissal update on February 27, 2026, it still did not correct the materially false and misleading allegations remaining in the press release.

145.     For example, the press release continues to state that Dr. Gabrielian told the UC she was motivated by patriotism toward Russia to provide any assistance she could, "even if it meant being fired or going to jail."

146.     However, DOJ later abandoned the phrase "even if it meant being fired or going to jail" by striking it from the superseding indictment because it was a misrepresentation of evidence. DOJ, in fact, had a recording from Dr. Gabrielian's meeting with the UC in which Dr. Gabrielian stated the opposite: "I do not want to risk being fired or going to jail."

147.     That false statement remains in the public press release even after DOJ's February 27, 2026, update.

148.     The press release continues to claim that Dr. Gabrielian "had no such concerns" about "violating HIPAA." In the superseding indictment, DOJ struck this phrase because it was not based on the evidence and because the DOJ's lead prosecutor agreed it was "demonstrably false."

149.     DOJ did not remove this statement from the press release, including when it added the February 27, 2026, dismissal update.

150.     DOJ's February 27, 2026, update was materially insufficient. It did not withdraw the press release; did not revise the headline stating that Plaintiffs were "Facing Federal Indictment"; did not remove or correct the body's prosecution-era language stating that Plaintiffs

were scheduled or expected to have initial appearances and faced prison time; did not correct allegations DOJ had removed, narrowed, or abandoned in superseding indictments; did not disclose the superseding-indictment history; did not acknowledge this Court's findings concerning DOJ's dilatory conduct, neglect, and mishandling of the prosecution; did not remove the national-security framing; and did not notify or correct downstream background-screening, licensing, credentialing, or employment systems that had already relied on DOJ-sourced information.

151.    The update was also too late to prevent the adverse effects already caused by DOJ's inaccurate and incomplete records, including incorporation of DOJ-sourced information into background-screening systems, denial of credentialing and employment opportunities, licensing consequences, reputational harm, and concrete economic loss.

152.    Employers in Maryland, Virginia, Pennsylvania, and Florida rejected Dr. Gabrielian's applications after federal background checks – relying on DOJ-maintained records – flagged her in national-security terms as facing federal charges and the possibility of conviction and prison time, even long after the case had been dismissed with prejudice.

153.    In fact, since her arrest, trial, and the dismissal of all charges with prejudice, Dr. Gabrielian has applied for work at every major hospital system in the State of Maryland and the Commonwealth of Pennsylvania, but has been unable to secure full-time hospital employment in either state.

154.    As a direct and foreseeable result of DOJ's unlawful maintenance and dissemination of inaccurate records, Plaintiffs suffered adverse effects within the meaning of 5 U.S.C. § 552a(g)(1)(D), including denial of employment and credentialing opportunities, loss of professional standing, reputational harm, and devastating economic loss.

155. These adverse effects flowed directly from DOJ's use of inaccurate records in systems relied upon by third parties to make determinations about Plaintiffs.

156. DOJ's conduct was intentional or willful because DOJ continued to maintain and disseminate inaccurate records after the superseding indictment, after dismissal with prejudice, and after Plaintiffs' counsel requested correction or withdrawal; failed to take timely corrective action; and, when it finally added the February 27, 2026 dismissal update, failed to correct the materially false and misleading allegations remaining in the press release.

157. DOJ's failure to timely respond to Plaintiffs' counsel's December 20, 2025, request, followed by its belated and materially insufficient February 27, 2026, update, demonstrates intentional or willful maintenance and dissemination of inaccurate, untimely, and incomplete records.

158. As a direct and foreseeable result of DOJ's intentional and willful publication, maintenance, dissemination, delayed annotation, and materially insufficient correction of the September 29, 2022, press release, Dr. Henry and Dr. Gabrielian suffered specific and quantifiable economic losses.

159. Following publication of the press release, which identified Dr. Henry and Dr. Gabrielian by name and profession and framed the allegations in national-security and espionage terms, both Plaintiffs were immediately rendered unemployable.

160. Dr. Gabrielian was placed on leave from her position at Johns Hopkins University Hospitals, resulting in the loss of her salary, benefits, and qualifying employment for Public Service Loan Forgiveness. Likewise, Dr. Henry lost the ability to obtain or maintain clinical employment.

161. At the time of this filing, he has still not been able to secure full-time work.

162.    During the period from September 2022, through dismissal of the criminal case in May 2024, Dr. Henry and Dr. Gabrielian's combined household income collapsed by approximately ninety percent, resulting in substantial lost wages and employment benefits.

163.    Each of these economic losses constitutes actual damages and is capable of precise calculation based on employment records, tax filings, and compensation history.

164.    Plaintiffs are thus entitled to relief under 5 U.S.C. § 552a(g)(4), including actual damages and attorneys' fees and costs.

**COUNT 2: The FACIS Level 3 Background Record – FACIS Record No. 1277755184**
**Violation of the Privacy Act – 5 U.S.C. § 552a(g)(1)(D)**
**(Plaintiff Dr. Gabrielian Only)**
**(Against DOJ Only)**

165.    Plaintiff Dr. Gabrielian incorporates by reference, repeats, and re-alleges all foregoing paragraphs, as if fully set forth herein.

166.    To state a claim under 5 U.S.C. § 552a(g)(1)(D), a plaintiff must allege that: 1) the defendant is a federal agency; 2) the agency failed to comply with a provision of the Privacy Act, including the requirement to maintain records with accuracy, relevance, timeliness, and completeness; 3) the failure caused an adverse effect on the plaintiff; and 4) the agency acted intentionally or willfully.

167.    Where, as here, the agency's intentional or willful violation causes adverse effects that result in pecuniary loss, the plaintiff is entitled to recover actual damages under 5 U.S.C. § 552a(g)(4).

168.    As detailed above, DOJ maintains and disseminates records concerning Dr. Gabrielian that are relied upon by third-party background-screening systems, including the FACIS Level 3 background check system used by healthcare employers and credentialing bodies. Dr.

Gabrielian's August 2024 FACIS report incorporated DOJ-sourced information long before DOJ's belated February 27, 2026, dismissal update.

169.    The DOJ-sourced information appearing in the FACIS Level 3 report is a "record" maintained by DOJ within the meaning of the Privacy Act. *See* 5 U.S.C. § 552a(a)(4) (identifying a record under the Privacy Act as "any item, collection, or grouping of information about an individual"); 28 C.F.R. § 16.41(b); *Williams v. Department of Veterans Affairs*, 104 F.3d 670, 673-74 (4th Cir. 1997)

170.    Dr. Gabrielian's FACIS Level 3 report explicitly identifies DOJ and the USAO-D. Md. as the "Authority" confirming not only the report's accuracy, but also its timeliness.

171.    Dr. Gabrielian's FACIS report reproduces – verbatim – the September 29, 2022, DOJ press release and identifies the "Publication" as "United States Department of Justice, The United States Attorney's Office, District of Maryland –, News and Press Releases."

172.    The FACIS report further states that "[t]he information in this report as of the date of preparation has been confirmed with the issuing agency as being current." The report was completed on August 26, 2024, more than three months after this Court dismissed all charges against Dr. Gabrielian with prejudice and approximately eighteen months before DOJ added its February 27, 2026, dismissal update to the press release.

173.    DOJ therefore did not merely publish stale information passively: according to the FACIS report, DOJ-sourced information was confirmed with the issuing agency as current after the criminal case had already been dismissed with prejudice.

174.    Yet after dismissal of all criminal charges referenced in the press release and reproduced verbatim in the FACIS report, DOJ failed to ensure that records disseminated to and relied upon by FACIS accurately reflected the final disposition of the case. DOJ's February 27,

2026, update came too late to prevent the August 2024 FACIS report from representing DOJ-sourced information as current.

175. At the time the FACIS report was prepared and used, it continued to represent Dr. Gabrielian as currently facing criminal charges, potential imprisonment, and serious misconduct, representing such information as "current" well after the prosecution was dismissed with prejudice.

176. DOJ therefore violated the Privacy Act by maintaining, confirming, and disseminating records concerning Dr. Gabrielian that were inaccurate, untimely, and incomplete after criminal charges against her were dismissed with prejudice. DOJ's later February 27, 2026, update did not cure the FACIS report's prior dissemination or the adverse employment consequences flowing from it.

177. Therefore, as a direct and foreseeable result of DOJ's unlawful maintenance and dissemination of inaccurate records, Dr. Gabrielian suffered adverse effects, including but not limited to the use of her FACIS Level 3 report by prospective healthcare employers resulting in lost employment opportunities.

178. DOJ's conduct was intentional or willful within the meaning of the Privacy Act because DOJ knew that the information it confirmed and disseminated through FACIS Level 3 was being used to make professional and credentialing determinations about Dr. Gabrielian, yet confirmed that information as "current" after the criminal charges were dismissed with prejudice and after this Court rejected DOJ's theory of harm. DOJ's later February 27, 2026, update does not cure its earlier confirmation and dissemination of inaccurate information through FACIS.

179. As a direct and foreseeable result of DOJ's intentional and willful maintenance and confirmation of inaccurate and incomplete records through the FACIS Level 3 system, Plaintiff

Dr. Gabrielian suffered proven pecuniary loss when her application for medical licensure in Florida was rendered futile.

180.    Dr. Gabrielian is thus entitled to relief under 5 U.S.C. § 552a(g)(4), including actual damages and attorneys' fees and costs.

**COUNT 3: NPDB Report DCN 5500000315986936 and Revocation of Clinical Privileges
Violation of the Privacy Act – 5 U.S.C. §§ 552a(g)(1)(C) and 552a(g)(1)(D)
(Plaintiff Dr. Henry)
(Against Defendants HHS and DHA)**

181.    Plaintiff Dr. Henry incorporates by reference, repeats, and re-alleges all foregoing paragraphs, as if fully set forth herein.

182.    The Privacy Act requires an agency that maintains a system of records to maintain all records used in making determinations about an individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination. 5 U.S.C. § 552a(e)(5).

183.    Under 5 U.S.C. § 552a(g)(1)(C), an individual may bring a civil action when an agency fails to maintain a record concerning him with the accuracy, relevance, timeliness, and completeness necessary to assure fairness in a determination relating to his qualifications, character, rights, benefits, or opportunities, and an adverse determination is made as a result.

184.    Under 5 U.S.C. § 552a(g)(1)(D), an individual may also bring a civil action when an agency fails to comply with any other provision of the Privacy Act in a manner that has an adverse effect on the individual.

185.    Where an agency's intentional or willful violation of the Privacy Act causes adverse effects that result in pecuniary loss, the individual is entitled to recover actual damages, attorneys' fees, and costs under 5 U.S.C. § 552a(g)(4).

186.     Defendant HHS maintains the NPDB, a federal system of records used nationwide by hospitals, credentialing bodies, licensing authorities, and healthcare employers to make determinations regarding physician credentialing, privileging, employment, and professional fitness.

187.     Defendant DHA exercises clinical privileging authority over physicians within the Department of Defense healthcare system and reports adverse privileging actions to the NPDB.

188.     Dr. Henry's NPDB report, DCN 5500000315986936, constitutes a "record" within the meaning of the Privacy Act because it contains information about Dr. Henry, identifies him by name and other identifying particulars, and is maintained and disseminated by federal agencies in a system of records. *See, e.g., Doe v. Thompson,* 332 F. Supp. 2d 124, 130–31 (D.D.C. 2004) (holding that the Privacy Act applies to records maintained in the NPDB and requires agencies to ensure that NPDB reports are "accurate, complete, timely, and relevant" before dissemination).

189.     On November 28, 2025, DHA permanently revoked Dr. Henry's clinical privileges.

190.     DHA reported that permanent revocation to the NPDB. The NPDB report concerning Dr. Henry was processed on December 23, 2025.

191.     The permanent revocation of Dr. Henry's clinical privileges was an adverse determination concerning his professional qualifications, character, rights, and opportunities within the meaning of 5 U.S.C. § 552a(g)(1)(C).

192.     The NPDB report concerning Dr. Henry is inaccurate, misleading, untimely, and incomplete.

193.     The NPDB report states that Dr. Henry's clinical privileges were permanently revoked based on findings of "professional misconduct."

194. The NPDB report does not identify any court, tribunal, or administrative body that made findings of professional misconduct against Dr. Henry.

195. The NPDB report does not identify any factual record establishing that Dr. Henry committed professional misconduct.

196. The NPDB report states that Dr. Henry "provid[ed] or conspir[ed] to provide medical records to the Russian government."

197. No court, tribunal, administrative body, or licensing authority has ever found that Dr. Henry conspired to provide medical records to the Russian government.

198. The NPDB report omits the dispositive fact that all criminal allegations underlying the Government's charging narrative against Dr. Henry were dismissed with prejudice by the United States District Court for the District of Maryland.

199. The NPDB report is misleading because it affirmatively implies a causal link between dismissed criminal charges (with prejudice) and the revocation of Dr. Henry's privileges.

200. The NPDB report also omits that the dismissal with prejudice followed this Court's findings regarding the DOJ's dilatory conduct, neglect, and mishandling of the criminal prosecution.

201. By reporting dismissed and unadjudicated allegations as "professional misconduct," and by omitting the dismissal with prejudice, Defendants maintained and disseminated a record that was not accurate, relevant, timely, or complete.

202. Defendants failed to maintain Dr. Henry's NPDB record with the accuracy, relevance, timeliness, and completeness reasonably necessary to assure fairness in determinations concerning his clinical privileges, professional qualifications, character, rights, and employment opportunities, as required by 5 U.S.C. § 552a(e)(5).

203.    DHA's revocation of privileges was an adverse determination based on inaccurate, incomplete, and unadjudicated allegations maintained or relied upon by DHA. DHA and HHS then compounded that adverse determination and the ensuing harm to Dr. Henry by maintaining and disseminating an inaccurate, incomplete, and misleading NPDB report.

204.    Moreover, Defendants' unlawful maintenance and dissemination of inaccurate and incomplete NPDB records have also caused adverse effects within the meaning of 5 U.S.C. § 552a(g)(1)(D).

205.    NPDB reports are disseminated nationwide to hospitals, credentialing bodies, licensing authorities, and healthcare employers.

206.    Hospitals, credentialing bodies, licensing authorities, and healthcare employers routinely rely on NPDB reports when determining whether a physician may obtain privileges, employment, credentialing, or licensure.

207.    As a direct and foreseeable result of Defendants' inaccurate, misleading, untimely, and incomplete NPDB report, Dr. Henry has been effectively barred from obtaining hospital privileges and institutional medical employment.

208.    Defendants' conduct was intentional or willful because Defendants knew, or acted with reckless disregard of the fact, that the criminal allegations referenced in the NPDB report had been dismissed with prejudice and had never resulted in an adjudicated finding of professional misconduct.

209.    Nevertheless, Defendants maintained and disseminated the NPDB report in a form that presented dismissed and unproven allegations as established professional misconduct.

210.    As a direct and proximate result of Defendants' intentional and willful violations of the Privacy Act, Dr. Henry has suffered concrete and substantial pecuniary losses. The revocation

of his clinical privileges has foreclosed his ability to obtain hospital privileges or institutional medical employment because hospitals, credentialing bodies, and healthcare employers are required to query and rely upon NPDB reports when making privileging and employment decisions. As a result, Dr. Henry has lost physician income and employment benefits, including impaired future earning capacity.

211.   These losses were the foreseeable consequence of Defendants' maintenance and dissemination of inaccurate and incomplete records through the NPDB.

212.   Dr. Henry's economic losses are capable of precise calculation based on his prior compensation history, prevailing physician compensation data, employment records, credentialing records, and tax records.

213.   Dr. Henry is entitled to relief under 5 U.S.C. § 552a(g)(4), including actual damages, attorneys' fees and costs.

### COUNT 4: Violation of the Fifth Amendment (Liberty Interest) – Stigma-Plus
### (Plaintiff Dr. Henry)
### (Against Defendants DHA and HHS)

214.   Plaintiff Dr. Henry incorporates by reference, repeats, and re-alleges all foregoing paragraphs, as if fully set forth herein.

215.   The Fifth Amendment of the United States Constitution prohibits the federal government from depriving a person of liberty without due process of law. U.S. Const. Amend. V; *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

216.   Although reputational harm alone is insufficient to establish a constitutional violation, a protected liberty interest is implicated where the government publicly stigmatizes an individual through false or misleading statements, and that stigma is accompanied by a tangible alteration of legal status or a government-imposed burden that forecloses or substantially impairs

the individual's ability to pursue their chosen profession. *See Paul v. Davis*, 424 U.S. 693, 708-710 (1976).

217. Government action – including through statutory or regulatory schemes that mandate dissemination of stigmatizing information to third parties who rely on that information in employment or credentialing decisions – can satisfy the "plus" element of a stigma-plus claim. *See Valmonte v. Bane*, 18 F.3d 992, 1000-01 (2d Cir. 1994); *Kartseva v. Department of State*, 37 F.3d 1524, 1528 (D.C. Cir. 1994); *Ridpath v. Board of Governors of Marshall University*, 447 F.3d 292, 311 (4th Cir. 2006).

218. A protected liberty interest is implicated where the government publicly disseminates stigmatizing allegations in conjunction with a statutory or regulatory scheme that imposes a "tangible burden" on an individual's ability to obtain employment, and where that dissemination foreseeably causes employers or credentialing bodies to deny employment or professional opportunities, amounting to government-imposed blacklisting. *Valmonte v. Bane*, 18 F.3d 992, 1000-01 (2d Cir. 1994).

219. Even absent a formal termination, government action that has the broad effect of foreclosing future employment opportunities in a plaintiff's chosen profession may give rise to a liberty interest. *Kartseva v. Department of State*, 37 F.3d 1524, 1528 (D.C. Cir. 1994).

220. Stigmatizing government action coupled with an involuntary employment action or exclusion from one's professional field may constitute a deprivation of liberty requiring due process. *Ridpath v. Board of Governors of Marshall University*, 447 F.3d 292, 311 (4th Cir. 2006).

221. Thus, to state a stigma-plus due process claim, a plaintiff must allege (1) government dissemination of false or misleading stigmatizing statements, (2) made in connection with official government action, (3) accompanied by a tangible alteration of legal status or a

government-imposed burden that forecloses or substantially impairs the plaintiff's ability to pursue their chosen profession, and (4) causation. *See Paul*, 424 U.S. at 708-710; *Valmonte*, 18 F.3d at 999-1001; *Kartseva*, 37 F.3d at 1528-29; *Ridpath*, 447 F.3d at 308-11.

222. Here, Defendants disseminated false, stigmatizing statements in Dr. Henry's NPDB report.

223. Specifically, the NPDB report falsely states that Dr. Henry "provid[ed] or conspir[ed] to provide medical records to the Russian government."

224. There is no evidence that Dr. Henry ever provided medical records to the Russian government, attempted to do so, or entered into any agreement with Russian government actors to do so. No court, tribunal, or administrative body has demonstrated any factual record or made any finding showing that Dr. Henry provided or conspired to provide records to the Russian government, and the criminal allegations asserting such conduct were dismissed with prejudice.

225. Defendants also disseminated misleading, stigmatizing statements in Dr. Henry's NPDB report.

226. Specifically, the NPDB report misrepresents dismissed criminal allegations as "findings of professional misconduct."

227. However, no court or administrative body ever established a factual record to find that Dr. Henry committed professional misconduct based on the alleged and now-dismissed criminal conduct. The alleged conduct was never proven, never adjudicated, and never sustained.

228. Defendants further disseminated misleading stigmatizing statements in the NPDB report by omitting the dispositive fact that the allegations the report references were dismissed with prejudice. That omission is material. A report that relies on the allegations while omitting the dispositive outcome is incomplete and misleading.

229.   DHA permanently revoked Dr. Henry's clinical privileges and reported that revocation to the NPDB, where the report disseminated the stigmatizing allegation that Dr. Henry "provid[ed] or conspire[ed] to provide medical records to the Russian government."

230.   In so doing, Defendants' actions imposed more than the intangible harm associated with reputational injury. Through a statutorily mandated reporting regime that employers are required to consult, Defendants imposed a concrete barrier to Dr. Henry's ability to seek and obtain employment, resulting in a government-created impediment to his professional opportunities.  See *Valmonte*, 18 F.3d at 1001 (holding that inclusion on a statutorily mandated registry consulted by employers imposed a concrete barrier to employment sufficient to satisfy the "plus" element of a stigma-plus claim).

231.   Defendant DHA further imposed a tangible burden by reporting the revocation of Dr. Henry's clinical privileges, together with stigmatizing allegations, to a federal practitioner-reporting system – the NPDB – that is disseminated nationwide to hospitals, credentialing bodies, and healthcare employers.

232.   By operation of this statutory dissemination regime, Defendants' actions functioned to exclude Dr. Henry from employment and credentialing opportunities within his profession, notwithstanding the absence of any adjudicated finding of professional misconduct.

233.   The combination of stigmatizing assertions and government-mandated dissemination constituted blacklisting by law and deprived Dr. Henry of a protected liberty interest.

234.   Dr. Henry was deprived of this liberty interest without constitutionally adequate process, as the stigmatizing assertions and professional exclusion were imposed without a finding of guilt, without an adjudication establishing misconduct, and in reliance on allegations dismissed with prejudice by a federal court.

41

235.    As a direct and proximate result of Defendants' deprivation of Dr. Henry's protected liberty interest, he has suffered concrete and continuing harm, including exclusion from his chosen profession, loss of professional standing, and loss of employment opportunities resulting from government-mandated dissemination of stigmatizing allegations without due process. The permanent reporting of false allegations of professional misconduct through the NPDB has operated as a legal barrier imposing a tangible burden by effectively foreclosing his ability to practice medicine.

236.    Because Defendants' conduct continues to impair Dr. Henry's protected liberty interest, he is entitled to declaratory and injunctive relief to remedy the ongoing constitutional violation. See 5 U.S.C. § 702.

## JURY DEMAND

237.    Plaintiffs demand a jury trial on all triable issues.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs Dr. Jamie Lee Henry and Dr. Anna Gabrielian respectfully request the following relief:

**A.  Privacy Act Damages**

    i.    An award of actual damages to Plaintiffs under 5 U.S.C. § 552a(g)(4), in an amount to be proven in this action, including but not limited to $25,000,000.00 for Dr. Henry and $25,000,000.00 for Dr. Gabrielian, for a total of $50,000,000.00, for lost wages, lost employment benefits, lost professional opportunities, impaired future earning capacity, loss of employment bonuses, licensing and/or credentialing-related losses, retirement and student-loan-related pecuniary losses, and other economic losses caused by Defendants' intentional or willful publication, maintenance, confirmation,

dissemination, delayed annotation, and materially insufficient correction of inaccurate, untimely, and incomplete records.

ii. An award of reasonable attorneys' fees and costs to Plaintiffs under 5 U.S.C. § 552a(g)(4)(B).

**B. Fifth Amendment Declaratory and Injunctive Relief (Plaintiff Dr. Henry)**

i. A declaration that Defendants Defense Health Agency and United States Department of Health and Human Services violated Plaintiff Dr. Henry's rights under the Fifth Amendment by imposing reputational stigma in conjunction with a government-mandated reporting burden that substantially impaired his ability to pursue his chosen profession, without due process of law.

ii. An order enjoining Defendants Defense Health Agency and United States Department of Health and Human Services from continuing to maintain, publish, report, or disseminate stigmatizing and misleading information concerning Dr. Henry through the National Practitioner Data Bank, where such information is based on allegations dismissed with prejudice or otherwise unsupported by adjudicated findings of professional misconduct.

iii. An order requiring Defendants Defense Health Agency and United States Department of Health and Human Services to correct, amend, withdraw, or annotate the National Practitioner Data Bank report concerning Dr. Henry to remedy the ongoing deprivation of his protected liberty interest.

**C. Other Relief**

i. Such other and further relief as this Court deems just and proper.

Dated: May 21, 2026

Respectfully submitted,

_____

David P. Sheldon, Esq.
Maryland Bar Number 15686

Law Offices of David P. Sheldon, P.L.L.C.
100 M Street, SE, Ste 600
Washington, DC 20003
Tel: 202.546.9575
Fax: 202.546.0135
Email: davidsheldon@militarydefense.com

*Attorney for Plaintiffs*